Charles SEWELL, Claimant
Below–Appellant

v.

DELAWARE RIVER AND BAY
AUTHORITY, Employer
Below–Appellee.

Civil Action No. 99A–07–003.

Superior Court of Delaware,
Sussex County.

Submitted: Nov. 18, 1999.
Decided: Feb. 29, 2000.

Henry C. Davis, Esquire, Henry C. Davis III, P.A., Georgetown, Delaware, Attorney for the Claimant Below–Appellant.

R. Stokes Nolte, Esquire, Wilmington, Delaware, Attorney for the Employer Below–Appellee.

**MEMORANDUM OPINION**

STOKES, Judge.

Presently before this Court is Charles Sewell's ("Claimant" or "the Claimant") appeal from a decision of the Industrial Accident Board ("Board") awarding him partial compensation for the partial permanent impairment to his right leg resulting from an accident that occurred while Claimant was working for the Delaware River and Bay Authority ("Employer"). This appeal places before this Court the following question of law:

> Under current Delaware law, is a claimant, under the Worker's Compensation laws, entitled to complete and non-apportioned compensation for the resulting impairment where an identifiable industrial accident has triggered a pre-existing, asymptomatic, and non-impairing condition?

As discussed fully below, neither the General Assembly nor the Delaware courts

have clearly addressed this issue. However, the great weight of authority in other jurisdictions finds the injury fully compensable and would not attempt to apportion the award between the accident and the pre-existing condition or infirmity. I find that Delaware law supports this majority view and thus reverse the decision of the Board.

## STATEMENT OF FACTS

At the time of the accident, the Claimant was employed by the Delaware River and Bay Authority to work at the Lewes, Delaware, terminal for the Cape May–Lewes Ferry. Claimant's precise position with the Employer was never identified but his duties were quite varied. Upon his arrival at work each morning, Claimant would unlock over forty doors and gates to prepare for the day's ferry traffic. He also raised the flags that flew on the terminal grounds. Prior to the first ferry's arrival, he would check the fire escapes and prepare the ropes that moor the ferry while at the terminal. When a ferry arrived, the Claimant would secure the ferry to the dock and run up a fire escape to let foot passengers in the terminal embark. He would collect the foot passengers' tickets and would count the tickets after the ferry left the terminal. A ferry is scheduled to arrive approximately every forty-five minutes. In between ferry arrivals, he might help clean the grounds or wash police cars. At other times, he might help prepare the ferry between trips by removing trash from the ferry and disposing of it at the terminal. This would entail running up and down several flights of stairs. Overall, his duties involved a substantial amount of walking and climbing steps.

On January 15, 1996, while completing his duties for the Employer, the Claimant fell when a step on a fire escape he was descending failed. He injured his right ankle and knee in the fall. Claimant testi-fied that he completed his shift that day, but that evening, the right knee and ankle began to swell "like a cantaloupe." The Claimant went to the Bebee Medical Center where he received an injection and a prescription to combat the pain.

Two days after the accident, the Claimant was examined by a board certified orthopedic surgeon, Dr. John Spieker, concerning his injury. Upon examination, Spieker observed a moderate amount of swelling in the knee and tenderness around the ankle. Dr. Spieker also reviewed x-rays of the Claimant's leg. Based on his examination and the diagnostic study, Dr. Spieker concluded that the Claimant suffered from an acute soft-tissue sprain and a pre-existing severe degenerative condition in his right knee consistent with osteoarthritis.

Dr. Spieker recommended rest and physical therapy and prescribed anti-inflammatory and pain-killing medications. He also placed the Claimant on a "no-work" status. Claimant made some progress but still had difficulties with his knee when Dr. Spieker saw him in early February of 1996. In March, 1996, Dr. Spieker released the Claimant to return to work with restrictions on his activity. The Employer modified Claimant's duties but after several weeks, it became apparent the Claimant's injury would prevent him from fulfilling even the restricted duties. The Claimant was unable to return to work.

Dr. Spieker continued to treat the Claimant and as recently as June, 1999, observed that the Claimant continues to be "clinically symptomatic" and that he has never returned to his pre-injury capabilities. While recent x-rays show no significant change in his degenerative condition, his knee is still moderately swollen. It is this swelling that causes pain and decreases his functional capabilities.

Based on this history of treatment, Dr. Spieker opined that the Claimant suffered a 22% permanent impairment to his right leg. In reaching this conclusion, he weighed the objective findings on loss of motion, loss of strength, and the diagnostic studies, which included the x-rays. When asked in his deposition to relate this permanent impairment to Claimant's accident at work, the following exchange occurred:

Q: Since there's no way to differentiate between the effects of the accident and his preexisting condition, can you relate his current condition, that is his current functional condition, to the accident or to the preexisting arthritis?

A: Well, I'd have to say that the accident is a result or cause of his present functional status. Since there's a constant here, which is arthritic changes on x-ray, they were present before and after. The only reason he is not able to work it appears at this time is because of the injury that he sustained to his knee that he did not recover fully from.

Q: Would it be fair to say that the limiting symptoms that he experienced are a direct result of the accident and not the preexisting arthritis?

A: Well, the preexisting arthritis, I mean, it plays a major role here because if a person had a normal knee and they had the same injury, they wouldn't have the same functional impairment at this time. Without giving an absolute with medical certainty assessment at which percent is which, I mean, I would have to say that they are both equally responsible.

Dr. Spieker Deposition at 17.

At the Employer's request, the Claimant was also examined by Dr. Andrew Gelman, a board certified orthopedic surgeon. Gelman saw the Claimant on January 17, 1997, and March 12, 1999. Dr. Gelman also reviewed Claimant's medical records. After examining the Claimant and his medical records, including x-rays, Dr. Gelman concluded that while the Claimant may have suffered a right ankle sprain and a sprain and contusion of the right knee as a result of the accident at work, those problems have resolved themselves. He also concludes that while the accident may have exacerbated his condition to some extent, the Claimant's current difficulties are attributed solely to his pre-existing degenerative condition, osteoarthritis. Moreover, he opined that it "is inevitable or would have been inevitable that right knee difficulties might have come to some sort of musculoskeletal attention irregardless of the January 15, 1996 accident." Dr. Gelman Transcript at 10.

Dr. Gelman concluded that Claimant suffered from a 25% permanent impairment to his right leg. In reaching this conclusion, Dr. Gelman relied on Table 62 of the AMA Guides, which provide guidance in establishing permanency ratings for injuries to the leg. Because the x-rays showed significant degenerative changes, and that Claimant's knee has only one millimeter of joint distance, the table assigns a 25% permanency rating to this condition. It accords no weight for a decrease in a person's range of motion. Finally, Dr. Gelman stated that the Claimant, because his x-rays showed the same degree of degeneration both prior to and after the accident, would have qualified for a 25% permanent impairment rating prior to the accident at work even though there was no evidence that the Claimant had any prior functional difficulties with his right leg.

The Claimant testified before the Board that he has been diagnosed with bilateral degenerative arthritis. However, while the degeneration is present in both knees, he apparently only experiences difficulty

with the right knee. The Claimant testified that prior to the accident at work, both legs were fully functional and he had no problems completing the duties assigned to him at work. Moreover, he was active outside work and enjoyed bowling, hunting, fishing, and serving as a Little League umpire. Since the accident, Claimant has been forced to curtail his participation in these activities and cannot climb more than three steps without difficulty. Most important to the present action, however, is the fact that Claimant has not been able to return to work.

On December 23, 1998, the Claimant filed a Petition to Determine Additional Compensation Due. The parties appeared before the Board on June 24, 1999, to address this petition. Following the hearing, the Board issued its decision on July 2, 1999, awarding the Claimant 11% permanent impairment.

In reaching their decision, the Board initially found that the Claimant had met the burden of proving that his impairment was work-related. The Board then found that "[i]n order to calculate the compensable portion of Claimant's impairment under the "but for" standard, the Board must determine Claimant's current level of impairment and then reduce that figure by the amount of impairment Claimant would suffer if the work accident had not occurred." Board Decision at 5. The Board was presented with two physician's opinions on the Claimant's current level of impairment. One doctor opined that based on Table 62 of the AMA Guides, Claimant suffered a 25% level of impairment. This table assigns impairment ratings for arthritis based on the space between the cartilage in the knee. The other doctor found a 22% level of impairment based on Claimant's loss of range of motion, loss of strength, and diagnostic studies. The Board adopted the 22% figure

because it took into account both the functional loss and the diagnostic studies. After adopting the 22% figure, the Board went on to find that the Claimant would suffer some level of impairment despite the accident and that "the amount of impairment attributable to the work accident is greater than zero but less than 22%." Board Decision at 6. Ultimately, the Board found that the work accident and the pre-existing condition were equally responsible and awarded the Claimant compensation based on an impairment level of 11%.

On July 20, 1999, the Employer moved to reargue because, among other things, the original decision calculated the maximum number of weeks the Claimant was to receive benefits based on an injury to the spine. The Board issued a corrected decision on August 5, 1999, that reflected the maximum number of weeks Claimant could qualify for compensation based on an injury to his leg rather than spine.

The Claimant appeals the decision of the Board arguing that the Board's decision was not supported by substantial evidence and that the apportioning of the injury's effects between the asymptomatic pre-existing condition and the work-related injury was contrary to Delaware's Worker's Compensation laws. The Employer, however, argues that the Board's decision is a correct application of the law and seeks affirmation of the Board's decision.

### STANDARD OF REVIEW

 The duty of this Court when acting on an appeal from the Board is to determine whether the board's decision is supported by substantial evidence and is free from legal error. *Johnson v. Chrysler Corp.*, Del.Supr., 213 A.2d 64, 66 (1965); *Devine v. Advanced Power Control, Inc.*, Del.Super., 663 A.2d 1205, 1209 (1995)(citing *General Motors v. Freeman*, Del.Supr., 164 A.2d 686, 688 (1960)); *General Motors*

*v. Jarrell,* Del.Super., 493 A.2d 978, 980 (1985). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.,* Del.Supr., 636 A.2d 892, 899 (1994); *Battista v. Chrysler Corp.,* Del.Super., 517 A.2d 295, 297 (1986). The Superior Court, when sitting as an appellate court, does not weigh the evidence, determine questions of credibility, or make its own factual findings. *Johnson v. Chrysler Corp.,* 213 A.2d at 66. It merely determines if the evidence is legally adequate to support the agency's factual findings. 29 *Del. C.* § 10142(d). In reviewing the record for substantial evidence, the Court will consider the record in the light most favorable to the party prevailing below. *General Motors Corp. v. Guy,* Del.Super., C.A. No. 90A–JL–5, Gebelein, J., 1991 WL 190491 (August 16, 1991). As to errors of law, the Court's review is plenary. *Brooks v. Johnson,* Del.Supr., 560 A.2d 1001, 1002 (1989).

### ANALYSIS

■ ***Causation and Compensability.*** The Worker's Compensation laws reflect a public policy to compensate employees for injuries "arising out of and in the course of employment." *See,* 19 *Del. C.* § 2301(12). Moreover, this relief is an injured employee's sole remedy for personal injury or death by accident that occurs within the employment relationship. 19 *Del. C.* § 2304. "While the law is not a general health insurance statute, it should be interpreted liberally to fulfill its intended compensation goal under § 2304." *Duvall v. Charles Connell Roofing,* Del.Supr., 564 A.2d 1132, 1134 (1989). Thus, before a claimant is entitled to compensation, he or she must show that the injury for which compensation is sought is work related.

Showing this causal connection between the work-related accident or activities and the resulting injury is challenging where the accident exacerbates a previously latent or dormant pre-existing condition that leaves the employee more susceptible to injury. The Delaware courts, in addressing this problem, have established two tests for causation and hence compensability. One test addresses the situation where normal work activities aggravate a pre-existing condition and the other applies where a specific and identifiable work-related accident aggravates the pre-existing condition.

■ "In cases where a claimant is injured by the aggravation of a pre-existing condition *and* there is no identifiable industrial accident, ... causation is governed by the usual exertion rule." *State v. Steen,* Del.Supr., 719 A.2d 930, 932 (1998) (emphasis original) (citing *Duvall v. Charles Connell Roofing,* Del.Supr., 564 A.2d 1132 (1989)). The "usual exertion" rule "provides that the injury is compensable, notwithstanding the previous condition, if the ordinary stress and strain of employment is a 'substantial factor' in causing the injury." *Id.* In *Steen,* a Deputy Chief of a volunteer fire company was permanently disabled by a ruptured aneurysm he suffered while under the stress of responding to a horrible automobile accident. Steen's injury was found compensable, despite the fact that the ruptured aneurysm was a result of a pre-existing condition, because the normal stress of his work was found to be a substantial factor in causing his condition to become impaired at that time.

■ Where, however, there is an identifiable work-related accident, the "compensability of any resultant injury must be determined exclusively by an application of the 'but for' standard of proximate cause." *Steen* at 932 (citing *Reese v. Home Budget*

*Ctr.*, Del.Supr., 619 A.2d 907 (1992)). In *Reese*, the Supreme Court stated:

> The "but for" definition of proximate cause in the substantive law of torts finds equal application in fixing the relationship between an acknowledged industrial accident and its aftermath. If the worker had a preexisting disposition to a certain physical or emotional injury which had not manifested itself prior to the time of the accident, an injury attributable to the accident is compensable if the injury would not have occurred but for the accident. The accident need not be the sole cause or even a substantial cause of the injury. If the accident provides the "setting" or "trigger," causation is satisfied for the purposes of compensability.

*Reese* at 910.

Thus, under the "but for" test, "a preexisting disease or infirmity, whether overt or latent, does not disqualify a claim for worker's compensation if the employment aggravated, accelerated, or in combination with the infirmity produced the disability." *Id.*

In the present case, the Board found the Claimant's injury was caused by a work-related accident and was thus compensable under the Worker's Compensation program. The Board's finding as to causation is supported by substantial evidence in the record and is not an error as a matter of law. There was evidence before the Board, both through the testimony of the Claimant and the depositions of the treating and examining physicians, that the Claimant had no physical or overt manifestations of his arthritic condition prior to his accident while on the job with the Employer. There is evidence that he was fully functional before the accident and that his current level of impairment arose out of and occurred as a direct result of his accident at work. This is sufficient evidence upon which the Board could find that the accident caused the Claimant to suffer a compensable injury.

***Apportionment.*** The more challenging issue facing this Court in this appeal is the question of whether the compensation awarded the Claimant should be apportioned between the pre-existing condition and the work-related accident. Ultimately, the Court concludes that this injury is fully compensable, apportionment was not appropriate, and a different result would require a legislative change to the Worker's Compensation laws.

As the Worker's Compensation program is designed by the General Assembly, in addressing issues arising under the program, Courts must look to the statute for guidance. By statute in a few states, "when a preexisting disease is aggravated by the employment, compensation is payable only for the percentage of disability attributable to the accident." 1 *Larson's Worker's Compensation Law* § 9.02(6) at p. 9–22 (1999). Professor Larson identifies five states that have this minority rule: California, Florida, Mississippi, North Dakota, and South Carolina. *Id.*, Digest Ch. 9 at D9–102.

In Delaware, the only Code provision that seems at first blush to apply to the situation at bar is 19 *Del. C.* § 2327. This section provides:

> Whenever a subsequent permanent injury occurs to an employee who has previously sustained a permanent injury, from any cause, whether in line of employment or otherwise, the employer for whom such injured employee was working at the time of such subsequent injury shall be required to pay only that amount of compensation as would be due for such subsequent injury without regard to the effect of the prior injury. Whenever such subsequent permanent injury in connection with a previous per-

manent injury results in total disability as defined in § 2326 of this title, the employee shall be paid compensation for such total disability, as provided in § 2324 of this title, during the continuance of total disability, such compensation to be paid out of a special fund known as "Worker's Compensation Fund." 11 *Del. C.* § 2327(a) (1998 Supp.). Judges, however, in interpreting this section, have ruled that a "previously sustained permanent injury" does not include naturally occurring degenerative changes to the body as a result of the aging process. *See Nastasi–White, Inc. v. Futty*, Del.Supr., 509 A.2d 1102 (1986); *H. & A. Electric v. Bickling*, Del.Super., C.A. No. 94A–09–005, Ridgely, P.J., 1995 WL 562166 (August 24, 1995) (ORDER). In *Nastasi–White*, the Claimant suffered from osteoporosis, which left his bones brittle. While at work, he lifted a heavy box and suffered a cracked vertebra. The employer sought reimbursement from what is now the Worker's Compensation Fund. The Supreme Court, in defining "injury" in the Worker's Compensation context, ruled that pre-existing conditions resulting from the natural aging process are not the types of work-related trauma covered by the statute. *Nastasi–White* at 1104. Similarly, in *H. & A. Electric*, the Court found the statute inapplicable to a claimant's pre-existing diabetes. *H. & A. Electric* at 5.

Here the Claimant suffers from a naturally occurring degenerative condition, osteoarthritis, that has progressed with age. This type of condition is not a "work-related trauma" and thus falls outside the scope of § 2327. Moreover, the Employer is not seeking reimbursement from the Worker's Compensation Fund.

No other statutory provision permits the apportionment of compensation between the Claimant's pre-existing condition and the work-related accident. Thus, the Court must look elsewhere for authority permitting the apportionment in this case.

Several cases in Delaware have addressed this issue of the relationship between a pre-existing condition and subsequent work-related accident. Most cases, however, have dealt with the issue of causation only and have not addressed whether apportionment is proper or required once there has been a finding of causation.

Professor Larson, in his oft-cited treatise *Larson's Worker's Compensation Law* states the following as the majority view on the issue of apportionment:

> Nothing is better established in compensation law than the rule that, when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable, and *except in states having special statutes on aggravation of disease,* no attempt is made to weigh the relative contribution of the accident and the preexisting condition to the final disability or death. Apportionment does not apply in such cases, nor in any case in which the prior condition was not a disability in the compensation sense.... The principle that degeneration and infirmities due to age which have not previously produced disability are not a proper basis for reduction of compensation is amply supported by authorities from other jurisdictions.

5 *Larson's Workers Compensation Law* § 90.04(1) (1999) (emphasis added).

*American Jurisprudence* echos this widespread rule. 82 Am.Jur.2d *Worker's Compensation* § 319 (1992) ("In the absence of a provision for apportionment of the compensation between an injury and pre-existing disease, there is no requirement to determine the relative contribu-

tion of the accident and the prior disease to the final result.").

In 1995, in *H. & A. Electric,* President Judge Ridgely found that a work-related accident that aggravates "a prior nondisabling defect or disease ... is not apportionable." *H. & A. Electric* at 5. In reaching this result, the Court was persuaded by the almost universal rule of unrestricted coverage reported by Larson. *Id.* This conclusion also follows from the General Assembly's intention to afford injured workers complete relief from employment-related accidents.

While our Supreme Court has not spoken directly on this point, this result is consistent with the language of the *Reese* Court that the exacerbation of a previously asymptomatic pre-existing condition by an identifiable work-related accident is compensable once causation is shown. *Reese,* 619 A.2d at 910. The Supreme Court, in finding the injury "compensable," did not limit the compensability in any way. The following passage from *Reese* also argues against limiting or apportioning the compensation:

> In work-related claims, as in personal injury claims sounding in tort, the employer takes the employee as he finds him. The liability of an employer is not limited to injuries which a physically able and mentally sound employee would sustain in similar accidents. *Id.*

Similarly, *Duvall,* in establishing the test for causation where usual job activities aggravate a pre-existing condition, states that a claimant may be entitled to "compensation" but does not restrict that relief. *Duvall,* 564 A.2d at 1133 ("[A]n injury is compensable if the ordinary stress and strain of employment is a substantial cause of the injury.").

Another point must be addressed. This concerns the concept that "it is the duty of the Board, not a physician, to fix a per-

centage to a claimant's disability." *See Turbitt v. Blue Hen Lines, Inc.,* Del.Supr., 711 A.2d 1214, 1215 (1998) (citing *Asplundh Tree Expert Co. v. Clark,* Del.Super., 369 A.2d 1084, 1089 (1975)). The Superior Court used this theory in a factually similar case to affirm the Board's decision disallowing part of a compensation award that was related to a pre-existing degenerative condition. *Mangle v. Grotto Pizza, Inc.,* C.A. No. 96A–09–004, Graves, J., 1997 WL 358671 (May 13, 1997) Let. Op. Upon further appeal, the decision was affirmed "on the basis of, and for the reasons set forth in, the decision of the Superior Court." *Mangle v. Grotto Pizza, Inc.,* Del. Supr., No. 215, 1997, 1997 WL 664688 (Oct. 22, 1997) (ORDER).

■■ *Turbitt* may be reconciled with *Reese* and *H. & A. Electric* because, while the Board has the authority to set percentages, in setting those percentages, the Board may not apportion the compensation between the asymptomatic pre-existing condition and the work-related injury that aggravated the condition without legislative authority. In *Mangle,* the Court did not rule on, nor did it address, the legal question of the appropriateness of apportionment. Rather, the Court ruled that the Board's decision as to the level of impairment was supported by substantial evidence and that the Board adequately stated the basis upon which it arrived at the award. *Mangle* at 4.

■■ The appropriate rule of law in this case is the one adopted by President Judge Ridgely. Moreover, this rule follows the rationale of *Reese* and the majority rule identified by Larson. An employer takes its workers as they are and may not escape liability because an injured employee with a pre-existing condition sustains injuries that are greater than or different

from those that a physically sound individual would experience.

In the present case, the Board adopted Dr. Gelman's testimony that the Claimant would have suffered some degree of impairment even if the accident had not occurred because of the severe level of degeneration. However, if the Court allows the Board to discount the Claimant's compensation to account for the portion attributed to the pre-existing condition, the Court would be limiting the Employer's liability to those injuries that a physically sound employee would sustain in a similar accident. This is prohibited by *Reese.*

■ It would also be blinking at reality to ignore the fact that the Claimant suffered no functional impairment prior to the accident, even though his x-rays showed significant degeneration in the knees had occurred prior to the accident. Moreover, there is evidence that the Claimant has been diagnosed as having osteoarthritis in both knees yet it is only the knee injured at work that is currently impaired. The Claimant's present permanent impairment stems from an identifiable work-related accident. While there was some evidence before the Board that the Claimant would likely have eventually suffered some level of impairment from the degenerative condition, neither physician opined, with any level of confidence, when and to what degree such natural impairment would occur. In fact, such an opinion would likely be based upon speculation and possibilities, which the Board cannot accept. *See Canyon Constr. v. Williams,* Del.Super., C.A. No. 95A–08–006, Lee, J., 1996 WL 190027 (March 11, 1996) Mem. Op. at 2.

## CONCLUSION

■ The Board should not have parsed the Claimant's award. Given the remedial nature of the Worker's Compensation law and the public policy of the General Assembly to provide complete relief, a change in the statute would be necessary to permit apportionment as allowed in the five states identified by Larson. This ruling follows President Judge Ridgely's holding in *H. & A. Electric.* This conclusion is consistent with the clear language of the Supreme Court in *Reese* and with the principle that the Board may set percentages in different circumstances. When an industrial injury triggers disability or impairment from a latent prior condition, the entire condition is compensable and no attempt should be made to weigh the relative contribution of the accident and the pre-existing condition to the final result. In the present case, substantial evidence supports the Board's finding that the industrial accident caused the Claimant's impairment. However, in light of the applicable rule of law, apportioning the compensation award in the context of this case was not legally correct.

Considering the foregoing, the Board's decision is REVERSED and REMANDED for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**